## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| SUZANNA F. GREER, *et al.*, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 2:19-cv-60-GMB |
| | ) |
| THE CINCINNATI INSURANCE | ) |
| COMPANY, *et al.*, | ) |
| | ) |
|     Defendants. | ) |

## **MEMORANDUM OPINION AND ORDER**

The instant complaint arises out of a tragic event. Terry Greer, who at the time served as the Senior Pastor of Gardendale-Mt. Vernon Methodist Church, shot and killed his wife, Lisa Greer, and shot and injured their teenaged daughter, Suzanna Greer. The road to the complaint involved a state-court criminal proceeding and a state-court civil proceeding that resulted in consent judgments against Terry Greer in the amount of $3.5 million for Suzanna Greer and $3 million for the Estate of Lisa Greer ("The Estate"). As explained in detail below, the central issue before this court is whether Defendants The Cincinnati Insurance Company ("Cincinnati") and GuideOne Mutual Insurance Company ("GuideOne") must provide coverage to Terry Greer for the consent judgments entered against him. Doc. 1-1. For the following reasons, the court concludes that Cincinnati and GuideOne are not liable for the consent judgments as a matter of law.

# I. PROCEDURAL HISTORY

On November 29, 2018, Suzanna Greer and the Estate filed a civil complaint against Cincinnati and GuideOne in the Circuit Court of Jefferson County, Alabama. Doc. 1-1. The complaint alleges that the two insurance companies "should have insured Terry Greer for [his] negligent acts" (Doc. 1-1 at 4), but had denied coverage. Doc. 1-1 at 5. The complaint asserts a claim for breach of contract and claims under Alabama Code §§ 27-23-1 and 27-23-2 against both defendants. Doc. 1-1 at 6–8. On January 10, 2019, the defendants jointly removed the case to this court, answered, and filed counterclaims for declaratory relief. Docs. 1, 4, 10, 13, 20, 32 & 41.

Before the court are two motions for summary judgment and two motions to strike. Cincinnati filed the first motion seeking summary judgment on the plaintiffs' claims[1] (Doc. 59), along with a brief (Doc. 59-1) and supporting evidence (Docs. 60–65 & 71). On the same day, GuideOne filed its motion for summary judgment on the plaintiffs' claims[2] (Doc. 66), along with a brief (Doc. 67) and evidence (Docs. 68–70) in support. The plaintiffs filed a response (Doc. 76) and evidence (Doc. 77)

---

[1] The court construes this motion also to be seeking summary judgment on Cincinnati's First Amended Counterclaim for declaratory relief. Doc. 41 at 20–65. Resolution of the motion for summary judgment necessarily resolves Cincinnati's request for a declaration that it "has no duty to defend and/or indemnify Plaintiffs for any damages, judgment, or settlements that Plaintiffs seek to recover in this action under all the policies of insurance issued by [Cincinnati] to Gardendale Mt. Vernon United Methodist Church . . . [and/or] the North Alabama Conference of the United Methodist Church." Doc. 41 at 65.

[2] As with Cincinnati's motion for summary judgment, the court construes GuideOne's motion to be seeking summary judgment on its Amended Counterclaim for declaratory relief. Docs. 4 & 13.

in opposition to both motions, and the defendants separately filed replies (Docs. 83 & 85) in support of summary judgment. Additionally, the defendants jointly filed two motions to strike. The first motion (Doc. 84) asks the court to strike the affidavit of Terry Greer (Doc 77-3) filed in opposition to summary judgment. The plaintiffs filed a brief (Doc. 87) in opposition to the motion and the defendants jointly filed a reply (Doc. 88) in support of the motion. The defendants jointly filed another motion to strike (Doc. 89) the second affidavit of Terry Greer (Doc. 87-2), which the plaintiffs submitted as an attachment to their response in opposition to the first motion to strike. The plaintiffs opposed the motion (Doc. 91), and the defendants filed a reply brief (Doc. 92). The four motions are ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but

to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III.  STATEMENT OF RELEVANT FACTS

### A.    The Insurance Policies

There are multiple insurance policies at issue in this case.  As relevant here, Cincinnati issued a Commercial General Liability policy and a Commercial Umbrella Policy to Gardendale-Mt. Vernon United Methodist Church with effective dates of coverage from December 10, 2011 to December 10, 2014. Docs. 64 & 65. Under these policies, Cincinnati is obligated to pay "those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Doc. 64-2 at 1.  Gardendale-Mt. Vernon Methodist Church is the named insured on the Cincinnati policies (Doc. 64-1 at 2), but there are individuals who also may qualify as an insured.  Under the Commercial

General Liability Policy, an "insured" includes "'employees,' other than . . . your 'executive officers' . . . but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business." Doc. 64-2 at 11–12. Additionally included as insureds are "church members, but only with respect to their liability for your activities or activities they perform on your behalf." Doc. 64-2 at 25. Finally, the policy covers any "[t]rustee, official or member of the board of governors of the church" and any "members of the clergy" but covers these groups "only with respect to their duties as such." Doc. 64-2 at 25. Similarly, the Commercial Umbrella Policy defines an insured as "[a]ny employee . . . while acting within the scope of their duties as such." Doc. 65-1 at 15.

GuideOne also issued insurance policies containing commercial general liability and commercial umbrella coverages to the North Alabama Conference of the United Methodist Church ("the Conference"). Docs. 70-3 to 70-6. Much like the Cincinnati policies, the GuideOne Commercial General Liability policy states that GuideOne "will pay those sums that the insured becomes legally obligated to pay as 'damages' because of 'bodily injury' or 'property damage' to which this insurance applies." Doc. 67 at 13. Similarly, the Umbrella Policy provides that GuideOne "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily injury' or 'property damage' to which this insurance applies." Doc. 70-6 at 30. The policies again define who may be an insured. As

relevant here, an "insured" under the GuideOne policies include "'employees' . . . but only for acts within the scope of their employment . . . or while performing duties related to the conduct of your business." Doc. 67 at 14 & 16. Additional insureds include "members, but only with respect to their liability for your activities or activities they perform on your behalf, at your direction and within the scope of their duties," as well as "any trustee or official; member of the board, council, deaconry, or vestry; 'minister' . . . but only with respect to their duties as such." Doc. 67 at 14 & 16.

## B.     Facts Underlying the Complaint

Terry Greer was ordained as a minister in the United Methodist Church in 1980 and he enjoyed a good reputation among his congregants and other clergy. Doc. 68-10 at 4; Doc. 68-7 at 8. At all times relevant to the instant case, Terry was the Senior Pastor at Gardendale-Mt. Vernon Methodist Church. Doc. 68-1 at 3. He remains a credentialed minister with the United Methodist Church. Doc. 68-10 at 4.

The general duties of a senior pastor are to be "responsible for the word and order of the local church." Doc. 71-1 at 8–9. In other words, he or she "is responsible to proclaim the word on a regular basis from the pulpit" and "responsible to make certain that the local church is ordered and functioning according to the laws, or the

guidelines laid out within the Book of Discipline[3] and governed by the appropriate leadership positions." Doc. 71-1 at 9. More simply, the senior pastor is "involved in pastoral case and preaching and teaching and leading spiritual matters of the church." Doc. 69-8 at 6–7. The senior pastor also "[m]akes[s] certain that the administrative work and order of the church is being cared for through the various committees and/or employees of the local church." Doc. 71-1 at 9. He or she handles the church's outreach and mission and ensures that safe sanctuary[4] and other church policies are followed and training is provided on those policies. Doc. 71-1 at 9–10. The senior pastor also ensures that the physical premises of the church are safe for occupancy and handicapped accessible. Doc. 71-1 at 10.

Terry and his family lived in a home on what is known as the church's parsonage, a property owned by Gardendale-Mt. Vernon Methodist Church. Doc. 71-1 at 10–11. The Book of Discipline states that the parsonage "is to be mutually respected by the pastor's family as property of the church and by the church as a place of privacy for the pastor's family." Doc. 62-8 at 24.

## 1. *Events Leading to the Shooting*

At some point in 2012, the Conference began an investigation into allegations

---

[3] The Book of Discipline contains the social principles, constitution, and governing rules for the United Methodist Church. Doc. 71-1 at 8.

[4] Safe sanctuary policies relate to the "care for children, youth, and vulnerable adults." Doc. 71-1 at 9–10.

of financial improprieties at Terry Greer's former church and plagiarism of sermons at Gardendale-Mt. Vernon Methodist church. Doc. 71-1 at 11; Doc. 68-7 at 9 & 15–16. On October 12, 2017, Terry met to discuss these allegations with Conference officials, including Ron Shultz, the Conference's Assistant Bishop and then-Superintendent of the South District Council, and Bob Alford, the Central District Superintendent and Terry's supervisor. Doc. 68-7 at 34; Doc. 71-1 at 6 & 13–14. Although the Conference officials concluded that Terry should undergo psychological testing and counseling, they did not communicate this recommendation to Terry at the meeting.[5] Doc. 68-7 at 36.

Leaving the meeting, Terry was involved in a single vehicle accident when he crashed his car into a culvert. Doc. 71-1 at 15; Doc. 68-7 at 36. While driving, Terry testified that he experienced cardiac symptoms similar to a previous heart attack, causing him to black out. Doc. 68-10 at 22. Terry suffered multiple injuries, including a fractured lumbar spine, a brain bleed, and burns to his face. Doc. 68-10 at 22. He remained in the hospital for four days (Doc. 68-10 at 22), then returned home for a "self-imposed or accidental leave of absence" (Doc. 71-1 at 18) during which he did not go inside the church building, provide any guidance or counseling, or preach. Doc. 60-10 at 29. He told the church community that he did not want

---

[5] In fact, they never communicated this recommendation to Terry. Doc. 68-7 at 36.

visitors at his home during this time. Doc. 68-10 at 91.

A few days after returning home from the hospital, on October 22, 2012, Terry fell from the back porch of the parsonage, fractured his skull, and sustained a subarachnoid hemorrhage. Doc. 68-1 at 9; Doc. 68-10 at 27. He was again hospitalized, this time for longer than a week. Doc. 68-1 at 9. After returning home from this hospital visit, Terry attempted to resume his work at the church. Although he was frail, he preached the community service on Thanksgiving Day in 2012. Doc. 68-10 at 30. The following day, Terry went to the church for part of the day and met with the staff to discuss Christmas bonuses. Doc. 68-10 at 37. Terry intended to return to his full duties as senior pastor toward the end of December 2012, but he became ill. Doc. 60-1 at 40. Because of his inability to resume his duties, the Conference assigned others to take care of the "day-in and day-out tasks that senior ministers would be responsible for," such as preaching, hospital and nursing home visitation, and meeting with various committees. Doc. 71-1 at 98.

As the weeks passed, Terry became more ill and depressed. On December 19, 2012, he voluntarily admitted himself to Brookwood Hospital in Birmingham, Alabama, to seek counseling for depression and thoughts of self-harm. Doc. 68-10 at 49–50 & 87. He was discharged the next day with a prescription for sleeping pills to help with insomnia. Doc. 60-10 at 87. Terry continued to seek help with his depression from a psychiatrist at Brookwood, who prescribed an antidepressant.

Doc. 68-10 at 49–50, 86 & 119.

Between December 20, 2012, and January 10, 2013, Terry remembers being "in a fog" and that his "thinking was very unclear." Doc. 68-10 at 88. He was not working, and he was depressed and feeling down. Doc. 68-10 at 89. He still was not receiving any visits from church members during this time. Doc. 68-10 at 91. He did not even want to leave the house. Doc. 61-2 at 19 & 56.

Around New Year's Day, Suzanna found a suicide note Terry had written to his wife Lisa on December 28, 2012. Doc. 61-4 at 3. The note began by stating, "My depressed mind can have no more." Doc. 61-4 at 3. The note gave detailed information on insurance, cremation, how to access the safety deposit box, and the like. Doc. 61-4 at 3. The note ended by stating, "I am so sorry and I love you both. Please forgive me." Doc. 61-4 at 3. The note did not indicate that Suzanna or Lisa were in danger.

On January 9, 2013, Terry emailed his supervisor, Bob Alford, to tell him that he had "been in a severe depression" since his October car accident and to ask for help. Doc. 69-6 at 2. The same day, he wrote another suicide note, this one addressed to both Lisa and Suzanna. Doc. 69-7 at 2–4. This note also gave instructions about financial and other practical matters such as selling vehicles and using a shorter obituary because it would be less expensive. Doc. 69-7 at 2–4.

## 2.    *Events of January 10, 2013*

Terry received a response from his email to Alford on the next day, January 10, 2013.  Alford told Terry that Alford would meet with the Gardendale-Mt. Vernon Parish Staff Relations Committee as soon as possible to discuss the needs for leadership in the church. Doc. 68-10 at 40.  Terry considered this email to be a "chastisement," and he interpreted it as an indication that he would be terminated. Doc. 68-10 at 40.  The email "threw [Terry] over the edge," and he did not have "a reasonable thought after about probably around 1 o'clock." Doc. 68-10 at 40.  Terry testified that he does not have any memories from this point forward relating to the incident. Doc. 68-10 at 41.

Terry began to act strangely on the morning of January 10, 2013. Doc. 68-4 at 5.  For instance, he asked Lisa that morning, "What if we all just drive up to heaven today?" Doc. 68-4 at 5.  Later that afternoon, he told Suzanna he had a present for Lisa hidden under his jacket but would not let her see what it was. Doc. 69-1 at 44; Doc. 68-4 at 6.  A short time later, Terry removed the jacket and revealed a .22 caliber pistol. Doc. 69-1 at 45; Doc. 68-4 at 6.  Lisa and Suzanna tried to get him to put down the gun, but he refused and instead shot Lisa. Doc. 68-4 at 6.  Lisa ran toward the living room and Suzanna ran toward the master bathroom.  While Suzanna was running, Terry shot her twice. Doc. 68-4 at 6.  Suzanna barricaded herself in the bathroom closet and heard more shots. Doc. 68-4 at 6; Doc. 69-1 at 45.

At this point, Terry shot Lisa and fatally wounded her. Doc. 69-1 at 45. He then came to the bathroom closet and tried to get inside. Doc. 68-4 at 6. Terry got his hand inside the door, shot several more times, and eventually forced open the closet door. Doc. 68-4 at 6. Suzanna wrestled the gun away from her father, ran to a neighbor's house, and called the police. Doc. 68-4 at 6–7; Doc. 69-1 at 45.

After Suzanna left, Terry stabbed himself numerous times with a knife. Doc. 68-4 at 7. When the police arrived, the officer found Terry in the master bathroom with a large knife protruding from his chest. Doc. 68-4 at 7. When the officer asked him what happened, Terry said "he went crazy" and admitted that "he had stabbed himself." Doc. 68-4 at 7. Terry attempted to take the officer's gun from him, but was unsuccessful. Doc. 68-4 at 7.

Lisa died the next day due to the injuries she sustained from the gunshot wounds to her head, neck, and hand. Doc. 68-4 at 8. Suzanna was treated at the hospital for gunshot wounds to her breast and her right arm, but released the day of the shooting. Doc. 68-4 at 8; Doc. 69-1 at 49. Terry stabbed himself eight times in the chest and had to undergo surgery to repair the damage. Doc. 68-4 at 8–9. He was hospitalized for one month and then transferred to the Jefferson County Jail. Doc. 38-4 at 9.

On May 13, 2013, the Probate Court of Jefferson County, Alabama, determined that Terry is an incapacitated person and appointed both a Guardian Ad

Litem and Conservator for him. Doc. 61-3 at 2–3.

## C.     Criminal Proceedings

On June 21, 2013, a grand jury in Jefferson County, Alabama, returned an indictment against Terry Greer for the murder of Lisa Greer and the attempted murder of Suzanna Greer. Doc. 60-3 at 2–3.  During the criminal proceedings, Terry was evaluated by at least three mental health professionals.  All three doctors essentially agreed that Terry suffered from dementia and serious depression, and had sustained a possible head injury from his fall off the porch "that contributed in kind of an awful storm to cause him not to know what he was doing was wrong at the time." Doc. 68-4 at 51.

On May 28, 2014, the Circuit Court of Jefferson County, Criminal Division, conducted a non-jury proceeding related to the indictment. Doc. 68-4.  The prosecution and Terry agreed on a stipulation of facts regarding the events of January 10, 2013. Doc. 68-4 at 4–9.  Dr. Glen King, a forensic psychologist, testified at the hearing that Terry suffered from severe depression and cardiovascular dementia at the time of the incident, causing him not to understand that what he was doing was wrong. Doc. 68-4 at 49.  Dr. King further testified that Greer suffered from a "psychotic feature" or delusion at the time of the shootings. Doc. 68-4 at 49–50. Following the hearing, the judge found Terry "not guilty by reason of mental disease or defect and [determined] that he was unable to appreciate the nature and quality of

the wrongfulness of his acts at the time of the offense." Doc. 60-2 at 52–53. The court ordered him to be committed to the custody of the Alabama Department of Mental Health. Doc. 60-2 at 58–59.

## D.    State-Court Civil Action

On January 9, 2015, Suzanna and the Estate filed a wrongful death and personal injury lawsuit in the Circuit Court of Jefferson County against Terry Greer, the Conference, certain employees and affiliated entities of the Conference, and various fictitious defendants (the "underlying lawsuit"). Docs. 60-5 & 60-6. On January 15, 2015, the Guardian Ad Litem for Terry requested that Cincinnati provide a defense for Terry in the underlying lawsuit. Doc. 62-7 at 4–6. Cincinnati refused to provide coverage because it concluded that he was not an insured relative to the attacks on his family. Doc. 62-7 at 7–8. GuideOne also denied Terry's request for coverage under its policies. Doc. 70-7.

The Estate and Suzanna settled their claims with Terry. Doc. 60-7 at 4–9. Specifically, Terry assigned all rights he had under the Cincinnati and GuideOne insurance policies to the Estate and Suzanna and agreed to the entry of consent judgments against him in the amount of $3 million in favor of the Estate and $3.5 million in favor of Suzanna. Doc. 60-7 at 4–9. The Estate and Suzanna agreed not to seek collection from Terry and to pursue collection "solely from any available insurance coverage." Doc. 60-7 at 5. On April 14, 2016, the Circuit Court entered a

consent *pro tanto* judgment order under seal. Doc. 60-8. The Estate and Suzanna eventually resolved the claims asserted against the Conference and the individual defendants through confidential settlements. Doc. 68-2.

## IV. DISCUSSION

The threshold question before the court is whether the Cincinnati and GuideOne policies cover Terry Greer for the events leading to the state-court lawsuit. The answer to this question turns on whether Terry was an insured party under the policies. For the following reasons, the court concludes that Terry was not insured under any of the policies at the time he killed Lisa and attempted to kill Suzanna.[6]

Under Alabama law, the insured bears the burden of establishing coverage by demonstrating that a claim falls within the policy's insuring agreement. *See St. Farm Fire & Cas. Co. v. Shady Grove Baptist Church*, 838 So. 2d 1039, 1043 (Ala. 2002). Whether as the assignees of Terry's rights under the consent judgment in the underlying state-court action or as judgment creditors under Alabama Code § 27-23-1, the Estate and Suzanna must establish that Terry's claims for defense and indemnity fall within Cincinnati's coverage of the Gardendale-Mt. Vernon Methodist Church and GuideOne's coverage of the Conference. *See Maness v. Ala.*

---

[6] Because of this conclusion, the court does not address the other arguments advanced by the defendants in favor of summary judgment.

*Farm Bureau Mut. Cas. Ins. Co*., 416 So. 2d 979, 981–82 (Ala. 1982).

All of the policies incorporate similar definitions of "insured." As explained in more detail above, the policies limit the definition of an insured to provide coverage only when those persons are acting "within the scope of their employment," "performing duties related to the conduct of your business," or acting "with respect to their duties." Doc. 64-2 at 11–12 & 25; Doc. 65-4 at 15; Doc. 61 at 14 & 16. While the exact language varies according to the policy, all are unified by the principle that coverage extends only to actions taken within the scope of employment.

Under Alabama law, "if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment." *Nelson v. Johnson*, 88 So. 2d 358, 361 (1956). As long as the evidence establishes that the act was "incident to carrying out the duties assigned by his master," the act is within the scope of employment even though the master "did not authorize the agent to resort to . . . improper or unlawful means . . . [that were] unknown to his master or even contrary to his express directions." *Solmica of the Gulf Coast, Inc. v. Braggs*, 232 So. 2d 638, 642 (Ala. 1970). In scope-of-employment determinations, "the dispositive question is whether the employee was engaged in an act that he was hired to perform or in conduct that conferred a benefit on his employer." *Hulbert v. State Farm Mut. Auto.*

*Ins. Co.*, 723 So. 2d 22, 24 (Ala. 1998). If, on the other hand, the employee is not performing acts he has been hired to do, but is "impelled by motives that are wholly personal," his actions fall outside the scope of his employment. *Solmica*, 232 So. 2d at 642–43. Even willful wrongs can fall within the scope of the actor's employment because "the motive behind the act does not [cause it to fall outside the employment's scope] unless it can be shown that the servant acted from wholly personal motives having no relation to the business of the master." *Plaisance v. Yelder*, 408 So. 2d 136, 137 (Ala. Civ. App. 1981) (citations omitted); *see also Doe v. Swift*, 570 So. 2d 1209, 1213 (Ala. 1990) (holding that the "conduct of the employee . . . must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment") (internal quotations and emphasis omitted).

The plaintiffs here have failed to meet their burden to establish that Terry Greer was acting within the scope of his employment during the shooting. There is no evidence in the record tending to prove that Terry's actions were incident to or in furtherance of the duties assigned to him by the Gardendale-Mt. Vernon Methodist Church or the Conference unless the court were somehow to shoehorn domestic violence into his duties to provide pastoral case, preach, and lead the spiritual and administrative matters of the church. That conclusion would be a bridge too far when there is no rational connection between his work in the church and his violent

attack on his family members.

In an attempt to avoid this conclusion, the plaintiffs argue that Terry was performing his duties as pastor in the weeks leading up to the shootings and that he was negligent in the performance of his administrative safety duties by keeping a gun in the parsonage. Doc. 76 at 39–42. While creative, these arguments miss the mark. Whether Terry performed some of his duties between October 2012 and January 2013 or was negligent in performing other duties is immaterial to the inquiry before the court.[7] Instead, the relevant inquiry is whether "the servant acted from wholly personal motives having no relation to the business of the master" or "the wrong was committed while the servant was executing the duties assigned to him." *Plaisance*, 408 So. 2d at 137. The court considers the wrong or the action giving rise to liability—not the actions that took place a few months or weeks beforehand, or even earlier that morning.

The court disagrees with the plaintiffs' contention that a potential insured's

---

[7] Because of this conclusion, the defendants' motions to strike (Docs. 84 & 89) are moot. The motions address two affidavits from Terry offering various information regarding the weeks and days before the shooting and the day of the shooting. Docs. 77-3 & 87-2. In their motions to strike, the defendants highlight myriad problems with the affidavits, including Terry's legal incapacity, deficits in his competency to testify to the matters stated, and contradictions between his affidavit testimony and his prior deposition testimony. Docs. 84 & 89. Additionally, both affidavits were prepared after the discovery deadline and in direct response to the motions for summary judgment. While the court has reservations about the admissibility of the affidavits, it does not reach this question because the affidavits are immaterial to the ultimate conclusion that Terry's actions were not covered by the relevant insurance policies.

motivation necessarily presents a jury question. Doc. 76 at 42. The plaintiffs highlight language from the Alabama Court of Civil Appeals stating that "[w]hether the servant was actuated solely by personal motives or by the interests of his employer is a question for the jury," *Plaisance*, 408 So. 2d at 137 (citation omitted), but they ignore the qualification in the next sentence: "This is so if there is any evidence having a tendency either directly or by reasonable inference to show that the wrong was committed while the servant was executing the duties assigned to him." *Id*. Here, there is no such evidence. Likewise, the court rejects the plaintiffs' contention that the state criminal court's adjudication of Terry as not guilty by reason of insanity precludes a finding that he operated out of personal motives in shooting his family. Doc. 76 at 43. Leaving aside the asymmetry of the legal standards, the critical question is whether any of the circumstances surrounding the shooting could lead a reasonable juror to conclude that Terry was serving his employer's interests when he shot his wife and daughter. A *post hoc* finding about his mental capacity at the time does not change those circumstances in any meaningful way.

Finally, the plaintiffs' comparison of this case to the facts in *Plaisance*, 408 So. 2d at 136, is misplaced. Doc. 76 at 47–50. In that case, Plaisance sued Yelder, a ready-mix concrete driver, alleging assault and battery. *Id.* Before the collision, Plaisance and Yelder had a heated interaction while leaving a jobsite in their vehicles. *Id.* After Yelder hit Plaisance's car with his concrete truck, Plaisance

walked towards Yelder, who was still sitting in the driver's seat of his work truck. *Id.* As Plaisance approached, Yelder stabbed him in the face with a screwdriver. *Id.* Plaisance then pulled Yelder from his truck and the fight continued on the street. *Id.*

The Alabama Court of Civil Appeals concluded that a jury question existed as to whether Yelder was acting within the scope of his employment at the time of the assault. *Id.* at 138. The court explained that

> in cases where a servant's deviation from the master's business is slight and not unusual, the court may determine, as a matter of law, that the servant was still executing the master's business. On the other hand, with a very marked and unusual deviation, the court may determine that the servant is not on his master's business at all. Cases falling between these two extremes must be regarded as involving merely a question of fact to be left to the jury.

*Id.* at 138. The court found that this case fell between the two extremes, noting that "the assault grew out of . . . the operation of the respective vehicles" and "there [wa]s evidence that the difficulty began while Yelder was still in the cab of his employer's truck." *Id.* at 138.

In contrast, Terry's actions on January 10, 2013, can only be described as a "marked and unusual deviation" from his employment as a minister. There is no evidence that the shooting grew out of Terry's work as a minister in any way. Terry did not lash out at his family because they were keeping him from his work for the church. He was not engaged in pastoral care. He was not speaking from the pulpit or even managing the administrative affairs of the church when he took up a gun

against his wife and daughter. No one at the church assigned him the task of shooting his family members. There is no good faith argument that Terry's domestic violence served the church's interests. With such a clean break, no reasonable jury could find that Terry was acting within the line and scope of his employment as a minister when he tried to kill his daughter and did kill his wife.

For these reasons, the court concludes that Terry is not an insured under any of the policies at issue. Summary judgment is due to be granted in favor of Cincinnati and GuideOne on the plaintiffs' claims and on the counterclaims for declaratory judgment.

## V. CONCLUSION

For these reasons, it is ORDERED that:

1.      Defendant The Cincinnati Life Insurance Company's Motion for Summary Judgment (Doc. 59) is GRANTED;

2.      Defendant GuideOne Mutual Insurance Company's Motion for Summary Judgment (Doc. 66) is GRANTED; and

3.      Defendants' Joint Motions to Strike (Docs. 84 & 89) are MOOT.

A separate order will be entered.

DONE and ORDERED on July 15, 2021.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE